The next matter, number 22-1700, Thomas J. Ciarametaro v. City of Gloucester, et al. At this time, would counsel for the appellant please introduce himself on the record to  Good morning, Your Honors, Liam O'Connell from Farrell Smith O'Connell, who represents the appellant plaintiff, Mr. Thomas Ciarametaro. May it please the Court, if I could also have two minutes for rebuttal at the end? Yes, you may. Thank you, Your Honor. Thank you, Your Honor. This matter comes to the Court as the District of Massachusetts enters summary judgment on First Amendment Section 1983 claims, which the District of Massachusetts ruled were, the defendants were immune, personally, under qualified immunity principles. And the District Court failed to properly evaluate the case. Rather, they simply, without any additional information or supporting authority or even reference, just stated that this speech was not clearly established, was not a clearly established constitutional right. The Court stated that in a very cursory, one-line, three-page decision. The Court did not go into the Pickering test, did not go into the Pickering analysis, did not weigh those factors, just stated that this was not a clearly established constitutional right. That was an error, as any public employee who speaks on matters of public concern, that is protected speech, and that has been a clearly established right. Well, but that's not, isn't Pickering the controlling principle here? I'm sorry, Your Honor. Don't we, isn't it clearly established that municipal officials, if they have a sincere and reasonable belief that speech on a subject by one of its employees will interfere with the performance of the office or the mission of the office, that they can indeed prohibit it? Yes, Your Honor. And Pickering is a very fact-sensitive analysis that, so if that's the balancing test they have to look at, is the speech protected, but is it going to interfere with the mission of the office? What case do you point to that clearly established for the city of Gloucester that this particular speech fell outside of that range? It's my argument that the speech was protected under Pickering, and I point to various cases, the Supreme Court, First Circuit, a Third Circuit case, which I will mention, which was not in my brief, which discusses opinion testimony being a form of protected speech. So if someone comes to you and says, what case clearly establishes that on this particular occasion on these sort of facts that you couldn't tell the harbormaster that he shouldn't be giving testimony that will alienate a large number of the people the harbormaster in his job needs to work with? I didn't see in your brief any case that really is particularly close to that, much less controlling well-established case law. I would first just state on the record that I don't think that the facts are clear that there was any problem with the community with Mr. Shimabutara's decision to do this, to testify in this case. That's been argued by the defendants in this case, but that certainly has not been, the district court did not state that. Counsel, I'm sorry to interrupt, but didn't your client essentially admit that in some of the texts that are in the evidence? I thought that was the one thing that everybody agreed on, that his expert opinion in the Lane case did cause some challenges with the community members that he was tasked with working in his role. Isn't that clear? Your Honor, I didn't take those texts and those conversations as admissions that this was creating problems. I took them as him understanding that, yes, he is the harbormaster and this does relate to fishermen, and that he understands that there's potential here, that there could be issues. But his testimony related to a tow line in a Good Samaritan case, it's not something that really goes to him as the harbormaster dealing with commercial fishermen and has had no impact. But wasn't there a letter sent to the city officials from the Lobstermen's Association? Yes, Your Honor. So that, I mean, and that's just documentary evidence that's in the record showing that community members were concerned. Your Honor, I'm glad you brought that up because that letter is a very important piece here. And I tried to connect the dots in the brief, but it's convoluted and there's lots of facts which were not dealt with by the district court. The insurance, the Masters Lobstermen's Association did send a letter to the city of Gloucester. And in that letter, they said something even to the extent of, you know, they hope that this Lane matter, that's the case, they hope this Lane matter can be resolved. I don't know why they're telling the mayor of Gloucester that and not the plaintiffs in the Lane matter. But I think that if you were to look at the brief, there is a fact pattern that has not been developed in discovery due to the defendant's, you know, inability to show up to a deposition. But it doesn't, the inquiry before us, unless you correct me if I'm wrong, but the inquiry is not, did the testimony interfere with relations? The testimony is, were the municipal officials reasonable in being concerned that it would? Perhaps it wouldn't, perhaps it would, but were they reasonable in being concerned that it would? And I again keep coming back to what case do you point to where the facts are even remotely close enough to say that it was unreasonable, objectively unreasonable, for them to have that concern? The case that I would point to, which is not in my brief, is a Third Circuit case, Schwartzwelder v. McNeely, 297F3228, it's a 2002 case. And that case pertained to police officers who were doing expert witness work on the side. And the police chief created a new policy that they couldn't do that. And the police officers, it's not a straight Pickering test analysis. It has to deal with issuing a policy that restricts speech before it happens. So it's not a direct, exact case, but it is useful. And that case says that whether someone voluntarily shows up to court for an opinion, for opinion testimony or not, or is subpoenaed to court for fact testimony, all of that is protected speech. So you should send us a 28-J letter, if that would. Counsel, don't we actually have law, First Circuit law, that strongly suggests that when you're trying to, in arguing for protected speech, when you're relying on the Pickering balancing test, the very nature of that test, which is nuanced, requires balancing, that it's particularly difficult to argue that there are clearly established precedents that would tell city officials that this is protected speech and they better be very careful about how they proceed. I mean, our law is pretty clear on that proposition. So you're up against law that really makes it exceptionally difficult for you to try to assert the proposition that you're asserting here. I agree, Your Honor. I don't know the case off the top of my head, but I know that there is a First Circuit decision which basically says that, that it's an uphill battle. If I could go back to Your Honor's question on the letter, and I can kind of answer both questions at once. The MLA letter, the Master's Lawsuit Letter. The reason why that's important is because the lane matter, the defendants in the lane matter, one of them was a fisherman, a commercial fisherman. And that defendant, his insurance company was the one who got involved. That insurance company is the same entity essentially. It's a different arm of the Master's Lawsuit Association. Yes, I'm familiar with those facts, so I guess the question I have for you goes back to, again, even if what your client did was engage in protected speech, let's just assume that, it goes back to my colleague's question, which is even if it was protected speech, there is a document in the record that shows that there was concern from community members. You may disagree whether that was genuine concern or it was for insurance reasons rather than genuine concern about what happened in that case. But the question is really whether the city officials were unreasonable in looking at that concern and concluding that action needed to be taken. So I guess what I'm really asking you is what is your best evidence that given those facts, let's assume it's protected speech, that what they did here was objectively unreasonable? What's your best argument? The timing, Your Honor. That letter did not come in until, and off the top of my head, I don't have the dates, but I believe it was two days after this all happened. So when Mr. Shimitara was initially told to get out of this expert witness job or lose his job as Harbormaster, that letter was not in the city's possession when that happened. It was a day or two later. Are you sure about that? I'm absolutely sure. Maybe you can double-check. I'm absolutely sure that it was before. Whether it was a day or two, I'm a little gray on that. But how does that help? How does that help you? He does something. The city officials say, geez, we're concerned that's going to upset people in the community you're supposed to deal with. And the next day or two, a letter comes in indicating people are upset. It just seems to establish the objective reasonableness of their concern. Your Honor, I see your point. But I think that if this case were to go throughout discovery and trial in the district court, there would be a lot of discovery on the Massachusetts Lobstermen Association and their insurance companies. It doesn't make any difference, though. They could have been yucking it up, saying we've got nothing, we're just going to make it look like a concern, that we'll fire the guy and everything like that. Unless that was all known to the city councilors, then who cares? All they know is their concern is going to be upset. They get a letter saying they're upset, so they do something about it. And pickering, as Judge Lopez has pointed out, has a type of balancing that leaves you in the position of belatedly finding a Third Circuit case on policemen and suggesting that's clearly established law. There is a First Circuit District of Rhode Island case, which I also submitted a 28-J on that. It's Brady v. Tamburini, 518F sub 3rd, 570, 2021, which holds basically the same issue, that government employees can volunteer and provide testimony. I know I'm out of time here, so I would finish by saying this, to your point, Your Honor, about the pickering test. I think that that's what was really an error here in the district court. The pickering test was not done. There was no analysis done on the pickering factors. It was just simply put out there that this was not protected, clearly established protected right. Thank you. Thank you, Your Honor. Thank you, counsel. At this time, if counsel for the City of Gloucester would introduce himself on the record to begin. Good morning. May it please the Court. My name is John Davis. I represent the defendant's City of Gloucester, as well as James Destino, Chip Payson, and Holly Dugwillow, three of the four individual defendants. I appreciate that the case law in the First Circuit is difficult for a plaintiff to prevail on a pickering balancing analysis, but two points I want to make in light of my opponent's presentation. Number one, this was not decided on a motion to dismiss, so he has made references several times to what the evidence might show. The record before Judge Young was a full and complete record on a motion for summary judgment, including a concise statement of undisputed facts, many of which the plaintiff did not oppose. Included among those undisputed facts was a statement, an affidavit, supported by an affidavit from James Destino, that he had received several complaints, many complaints from other people, that he did not bring to Mr. Sciamattaro's attention. That was admitted. The timing of the letter, I think, is, in fact, a day or two after Mr. Payson and Mr. Destino first spoke to the plaintiff, but their statements to the plaintiff are set forth in affidavits that were before Judge Young, and many of the facts set forth in those affidavits about their concerns, the concerns they had about public perception, a concern that the city hall might be viewed as anti-fisherman, concerns that they had about the ability of Mr. Sciamattaro to do his job going forward if he was testifying in a case that was adverse to the commercial fishermen and adverse, in fact, to the U.S. Coast Guard, a body that he belonged to. Counsel, if I may, I'm sorry, because we just don't have a lot of time with you, so I apologize for interrupting you, but the question I have for you is, ultimately, the appellant did not leave his job. He stayed, and so really what I wanted to focus you on is some of the other actions that he says through the summary judgment testimony, which, again, it's a summary judgment, so we have to give all plausible inferences to him. He says that he was denied a raise, he was excluded from important meetings, there was interference in a routine hiring decision by him, that all this happened, and so the question I have for you is, how were those particular actions necessary to address the concerns from the community? I understand there were concerns, but how were those actions necessary to address those concerns rather than just punitive? I believe, to go back to the facts and allegations he raised about how he was treated, I think that goes to whether or not there was justification for the restriction of the limitations or really it was criticisms by the public officials about what he had said. And second of all, was there an adverse employment action? He raises the argument that there was an adverse employment action, and as you know from the papers, we quarreled with that. But that's, in fact, one of the reasons why we did not make our motion for summary judgment based upon the fact that it was not protected speech. We focused more on the Pickering balancing, because if there are disputed issues of fact as to whether or not there was justification or whether or not there was an adverse employment action, Judge Jones is going to say, motion denied. Right, but how can denial of a raise not be an adverse employment action? And again, crediting his testimony for summary judgment purposes that he was denied a raise, A, how is that not an adverse employment action? And under Pickering, why would that have been necessary to address the legitimate concerns about what the community was saying? It just seems unconnected to me, and that's what I'm trying to understand. The record reflects in our papers that the alleged denial of the raise was one year before his speech, so the timing doesn't work. He was denied the raise one year before we even learned that he was providing expert testimony in the Lame D. USA case, so the sequence does not support the plaintiff. Second of all, additional material submitted in support of our motion for summary judgment showed that no department head was given raises. Jim Destino says that the request from Ms. Lee, the HR director, recommending that he be given a grade which I think would have been a raise of about $11,700, recommending that the mayor give him that, went only to Jim Destino, and Jim Destino says in his affidavit, we didn't have the resources within the city government to support that raise, and nobody got raises. No department heads got raises. So that was the record that was contrary to his allegation that I didn't get a raise because I engaged in protective activities. Counsel, in this Pickering balancing test, in this record there are some accounts of some pretty rough things that were said to him by the mayor, by other city officials. He was threatened. There seems to be no dispute about it. He was threatened, really almost in a physical way, and called names. I mean, really rough stuff. Now, is it your position that those facts have no relevance to whether the city's concerns, however inartfully expressed, were reasonable and justified their expressing concerns to him? How they went about expressing the concern just doesn't matter for Pickering balancing, except perhaps in terms of an adverse employment action, which can take the form of harassment and creating a hostile environment. So to your point, that only comes into play if you conclude that the city was not reasonable in expressing its concerns. Is that your position? I think, Your Honor, you're correct in the sense that to the extent there's a hostile work environment based upon speech or other activities within the city hall, that can be a factor. That's potentially a factor to be considered on the Pickering balancing. So I think the nature of the—if there is indeed an adverse employment action, I think the nature of the adverse employment action is something that the court can weigh, but the court can also weigh who he was as an actor. He's the de facto head of the city government, and he's a department head, and he's akin to the fire chief or the police chief or superintendent of schools. And he's not speaking here about Scituate Harbor or Boston Harbor or Beverly. He's focused on the city of Gloucester, Gloucester fishermen,  and that's why—that is what raised the concern of the public perception, and I think the court is correct to note that he, in effect, admitted that there was a problem of public perception by virtue of his speech, and he apologized to the mayor. I will try to make this right. But, Counsel, you agree that under our case law, harassment is sufficient to be an adverse employment action, correct? Yes, Your Honor, I believe that. I don't have a case on that, but I believe that's the case. But I just want to understand what you just argued. Are you arguing that harassment is insufficient just because the person at issue is sort of the head of a department? Is that your argument? No, no, no, no, Your Honor. No, I'm not making that argument. I'm just—I was making—among the factors that I think the court would have to take into account in conducting a Pickering balance. If there's nothing further, I'll allow that brief. Thank you. Thank you. Thank you, Counsel. At this time, Attorney Keston, please introduce yourself on the record. Again, you have a four-minute response. Good morning. My name is Leonard Keston. I represent the former mayor, Sefasyah Thaken, who is the person most referred to with the language. The language issue in this case goes to the third prong of the test. That was an adverse employment action. And to your question, yes, I would say that the stuff described, if you get to that, but first you have to get by the Pickering test. And in this case, frankly, on the facts, all I can tell you is what was he thinking. He's a harbormaster who spends the time in a large fishing community where you want to encourage people to rescue each other. And for him to take a paid job, I mean, there's no problem with him having an outside job with permission, but to take an assignment where he is going to be taking a position against the Good Samaritan and the United States Coast Guard, how could a public official, how could the mayor not think, reasonably think, that this was going to affect the relationship of the harbormaster's office with the Gloucester fishing community? She could tell that immediately. So could everybody else in City Hall. The fact that the letters come in later, but it was obvious. So the question is, could it? Of course. And it did. And in this case, the qualified immunity question is also, this is a very, this is, if anything, I suggest it's not a close call on the side of the mayor and the other individual defendants as to why they did what they did under Pickering. Counsel, if I may, again, I completely understand with you that there was concern from the community. The record shows that. So it would make sense and be reasonable for the city officials to want to take some sort of corrective action, to have asked the appellant to take some kind of corrective action. But I want to ask you the same question I asked your co-counsel, which is why the particular actions that are alleged to have happened here, including the harassment, in a sense, why were those necessary to address the concerns from the community? Why was the particular conduct here reasonable under Pickering? The complaint here that he makes is that she told him first, right? She told him or he got word, don't do this. That's the stifling of the First Amendment stuff. The alleged harassment, the rough language that was used is not part of stifling his speech. But it's the retaliation, right, which is part of the claim here, right? There's also a retaliation claim. But first you have to have a claim. You can retaliate. We deal with this all the time. People come and say we have a hostile work environment, and I said it has to be linked to something, a constitutional violation of discrimination, before it's a tort. But don't you agree that – I thought it was pretty clear that everyone agreed that he did engage in protected speech. I mean, the essence of the city official's argument is that he was speaking out on a matter of public concern in a way that he shouldn't have been. He should have been taking the other side. I don't know that this case is, let's say, being a paid expert. I agree it's public speech. The issue is not a public concern, no question. But when you're a paid expert, is there a case that that is protected? Actually, I'm intrigued by that. Are you suggesting that the fact that he was – he wasn't speaking as a concerned citizen. He was in the business. He was getting paid to express these concerns. Is there any law that would support the proposition that the fact he's getting paid to do what he did, that that's not protected speech? Are you suggesting that that's the way we should – I'm saying – Are you suggesting that we should question whether his speech was protected because he was paid to say what he said? I suggest that that goes – I've learned that that means shut up. One time I went way over once and was blinking. I said, well, it's just blinking. That's a question of a qualified immunity. You need to have a case that says that. And I think it's a legitimate question. And I would be delighted if this court said, we find that it isn't, so that there's guidance. You know, everybody looks – public officials look for guidance through qualified immunity in court cases. So I suggest that that's a factor. He was not out there saying, I legitimately believe that this poses a danger to the fishermen and this poor man died because they screwed up. He got paid by a plaintiff's lawyer to give an opinion in favor of the plaintiff. And that is particularly, I suggest, problematic when it's in his area, in his harbor. Again, I say to you, and I'll leave you with this, what was he thinking? If there's nothing else, thank you very much. Thank you. Thank you, Counsel. At this time, would Attorney O'Connell please reintroduce himself on the record to begin? He has a two-minute rebuttal. Thank you, Your Honors. Liam O'Connell for the Appellant Defendant, Mr. Scimitaro. Just briefly, I'll touch upon both my brother's comments. It's my position and our brief's position that when a public employee speaks on any matter of public concern, this is clearly a matter of public concern. If they speak on any matter of public concern, that is protected speech. The question then being whether or not being paid for the speech then somehow changes that analysis. The only case that I could find on point on that was that Third Circuit case, which said showing up to provide an opinion voluntarily or under compulsion is both protected. So I will provide that to the Court. Another quick factual basis that's important here to remember, this all happened in the March of 2020. The repudiation, the retaliation, it all began in March of 2020. Or sorry, April of 2020. Weeks, 10 days after Judge Saris and the District Court did not allow the summary judgment for the Lane defendants, the MLA insurers, they didn't allow the summary judgment and Judge Saris scheduled it for trial. Mr. Scimitaro had been involved in this case for over two years. Everyone knew about it. He had issued his expert opinion almost a year earlier. It wasn't until the trial was scheduled that this became a problem for the MLA and the city. Also, which is in the appendix, Mr. Scimitaro had been doing other expert witness work, paid expert witness work for other similar cases, including fishermen cases in Gloucester Harbor. And this is in the appendix. So it was just this case with this insurer that the city was concerned about. It wasn't the other cases. Mr. Scimitaro never heard a thing about the other cases. The Good Samaritan Law is an ancient doctrine, well accepted, so providing an opinion on that and on the tow is certainly valuable, as the Connick v. Myers court would find, this is valuable information. And lastly, Judge Saris relied on that in denying summary judgment for the Lane matter, TJ's, Mr. Scimitaro's actual position. And if I could just add one thing to the court that I do think is important here on the Coast Guard, because this was mentioned multiple times, that is the heart of First Amendment protected speech, challenging the government, coming from government people, and that's very important here. So I'm glad they mentioned that he was in the Coast Guard and challenged the Coast Guard, because that's important to the analysis. Thank you, Your Honors. Thank you, Counsel. That concludes argument in this case.